IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

KATRINA HALFPAP, JEAN
SEELINGER, and MARILYN
BLACKBURN,

    Plaintiffs,

    v.

CITY OF WEST PALM BEACH,
FLORIDA,

    Defendant.



05-80900

CIV-Civil Action No.
CIV-MIDDLEBROOKS

MAGISTRATE JUDGE
JOHNSON

---

**MEMORANDUM OF LAW IN SUPPORT OF
EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER**

---

    Plaintiffs, by and through counsel, hereby submit this memorandum of law in support of their application for temporary restraining order, filed along herewith.

## INTRODUCTION

    This action challenges the facial constitutionality of ordinances two recently adopted West Palm Beach. The first ordinance, WPB Code § 78-425, establishes a **fixed twenty (20) foot buffer zone** around the driveways and entrances of health care facilities adjacent to public rights of way. It is a **24-hour per day, 365-day per year content-based blanket ban** on certain types of political speech within the zone -- speech that "'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)). **A fixed buffer zone of this scope is unprecedented**.

    The second ordinance, WPB Code § 34-38(b), prohibits the use of all

"unnecessary noise" and amplified sound or sound reproduction equipment on public property within 100 feet of a health care facility. Plaintiffs desire to engage in expressive activities forbidden by these ordinances. For the following reasons, Plaintiffs are entitled to emergency preliminary injunctive relief.

## I.    PLAINTIFFS ARE ENTILED TO PRELIMINARY RELIEF.

"A temporary restraining order protects against irreparable harm and preserves the *status quo* until a meaningful decision on the merits can be made." *Schiavo ex rel Schindler v. Schiavo*, 358 F.Supp.2d 1161, 1163 (M.D.Fla. 2005) (citing *Canal Auth. of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974)).   In the Eleventh Circuit, the standard for issuance of a preliminary injunction is well-established.   In order to prevail, Plaintiffs must show 1) a substantial likelihood of success on the merits; 2) a substantial threat of irreparable injury; 3) their own injury outweighs the injury to the nonmovant; and 4) the injunction would not disserve the public interest. *Speer v. Miller*, 15 F.3d 1007, 1009 (11th Cir. 1994) (citation omitted).

### A.    Likelihood of Success on the Merits

To determine the likelihood of success on the merits, the Court looks to the standards provided by the substantive law. *See, e.g., Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir.1985). The substantive law in this case is found in federal case law. As will be shown in Sections II and III below, Plaintiffs have a substantial likelihood of success on the merits of their claims.

### B.    Plaintiffs Face Irreparable Harm

A showing of irreparable injury is "the *sine qua non* of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation omitted).   "[T]he asserted

irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176-77 (quotation omitted).   Plaintiffs easily meet this standard.

The immediate and irreparable harm facing Plaintiffs is plain: the challenged ordinances are set to go into effect on October 6, 2005, and Plaintiffs desire to engage in constitutionally protected activities that these ordinances prohibit with the threat of criminal sanctions on October 8.  *See* Declarations of Katrina Halfpap, Jean Seelinger, and Marilyn Blackburn, ¶¶ 3-7, attached to Application for Emergency Temporary Restraining Order as Exs. 1, 2, and 3, respectively.  "The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).    In the Eleventh Circuit, it is well-settled that an ongoing violation or chill on First Amendment rights constitutes irreparable injury warranting preliminary injunctive relief.  *See, e.g., Siegel*, 234 F.3d at 1178; *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983).  Plaintiffs thus satisfy the irreparable injury prong of the *Speer* test.

### C.   The Threatened Harm to Plaintiffs is Greater than any Potential Harm to Defendants that may Result from an Injunction.

Upon the finding of irreparable harm to Plaintiffs absent preliminary injunctive relief, the next step for the Court is to balance the likelihood of irreparable harm to Plaintiffs if relief is not granted, against the likelihood of harm to Defendant if relief were granted.  *See Church v. City of Huntsville*, 30 F.3d at 1332, 1342 (11th Cir.1994).

Plaintiffs intend only to peacefully exercise their right to free speech on the public ways immediately adjacent to the clinic driveway.  *See* Halfpap Decl, ¶ 7; Blackburn Decl. ¶ 7.  There is no doubt that such speech is protected by the First Amendment

because streets and sidewalks are "quintessential" public fora for free speech. *See, e.g., Frisby v. Schultz*, 487 U.S. 474, 480 (1988); *United States v. Grace*, 461 U.S. 171, 176 (1983) ("Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities, and are clearly within those areas of public property that may be considered, generally without inquiry, to be public forum property"); *Carey v. Brown*, 447 U.S. 455, 460 (1980) (same).

"[T]ime out of mind," such locations have been used for "assembly, communicating thoughts between citizens, and discussing public questions." *Boos v. Barry*, 485 U.S. 312, 318 (1988); *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public . . . and has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens").

"Streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Carey*, 447 U.S. at 460 (citation omitted). The Supreme Court has been clear that a public forum occupies "a 'special position in terms of First Amendment protection'" and "the government's ability to restrict expressive activities [in it] 'is very limited.'" *Boos*, 485 U.S. at 318 (quoting *Grace*, 461 U.S. at 180, 177). "It goes without saying that 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place'" *Grayned v. Rockford,* 408 U.S. 104, 118 (1972) (quotation omitted).

As demonstrated *supra*, the deprivation and chill on Plaintiffs' federally protected

rights constitutes irreparable harm.  On the other hand, if Defendant is restrained from enforcing the patently unconstitutional ordinances at issue, it will suffer **no** harm because the exercise of constitutionally protected expression can never harm any of Defendant's legitimate interests particularly where, as here, they occur in traditional public fora. Moreover, the challenged ordinances have not gone into effect, and preliminary injunctive relief will merely maintain the *status quo*.  Thus, the "balance of hardships" part of the preliminary injunction test tips decidedly in favor of Plaintiffs.

> **D.    A Preliminary Injunction in this Case Will Serve the Public Interest.**

Given the threat of irreparable injury to Plaintiffs and the lack of any real harm to Defendant, the public interest will be served by the issuance of preliminary injunctive relief. "The public interest always is served when constitutional rights, especially free speech, are vindicated." *University Books and Videos, Inc. v. Metropolitan Dade County*, 33 F.Supp.2d 1364, 1374 and n.4 (S.D.Fla. 1999) (noting that "the First Amendment protects not only speakers, but also members of the public interested in receiving communications that are protected by the First Amendment"). *See also Cate v. Oldham*, 707 F.2d 1176, 1190 (11th Cir. 1983) (holding the "strong public interest in protecting First Amendment values" favored preliminary injunctive relief)). The public interest will be served by the issuance of preliminary injunctive relief.

**II.    THE BUFFER ZONE ORDINANCE IS UNCONSTITUTIONAL**

### Text of Buffer Zone Ordinance

The buffer zone ordinance states, in pertinent part, "No person shall engage in protesting, picketing, distributing leaflets or handbills, attempting to impede access (sic), or engage in oral advocacy, education, or counseling activities within a designated public

safety buffer zone adjacent to a health care facility." WPB Code § 78-425(1). "'Designated Public Safety Buffer Zone' shall mean an area twenty (20) feet around a health care facility's driveway and entrances from public rights-of-way or other public areas immediately adjacent to the health care facility." WPB Code § 78-425(2). Abortion clinics are "health care facilities" as defined by the ordinance. WPB Code § 78-425(3). A violation of the buffer zone ordinance can result in a fine up to $500.00 and/or up to sixty (60) days in jail for each offense. WPB Code § 78-425 (incorporating § 1-13).

### A.      The Buffer Zone is in Effect 24-Hours Per Day, 365 Days Per Year

As noted in the introduction, the twenty-foot fixed buffer zone at issue here is **unprecedented** because it operates as a complete ban on certain messages within the zone **at all times**. The zone is unlike the floating buffer upheld in *Hill v. Colorado*, 530 U.S. 703 (2000), for example, which made "it unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . . .'" *Id.* at 707 (citation omitted). Nor is it like the floating buffer zone upheld in *McGuire v. Reilly*, 368 F.3d 45 (1st Cir. 2004), which created a floating six (6) foot buffer zone around any person in an eighteen (18) foot area, and only made it unlawful for a person to knowingly approach another person without consent for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling. *Id.* at 49. It is not even like the eight (8) foot fixed buffer zone upheld in *Edwards v. City of Santa Barbara*, 150 F.3d 1215 (9th Cir. 1998), which proscribed only demonstrations within the zone and therefore permitted sidewalk counseling and other forms of advocacy. *Id.* at

1215-16.  Unlike the ordinance here, ordinances at issue in *Hill*, *McGuire*, and *Edwards* did not make the buffered area off-limits entirely, but rather merely regulated conduct of speakers inside the zone.  Put another way, speakers were permitted to move freely inside the buffer zone so long as they did not approach unwilling listeners without consent.

Here, the ordinance makes the public ways within the buffer zone **off-limits to certain speakers 24-hours per day, 365 days per year**.  Thus, the challenged ordinance makes it unlawful to picket or protest in the zone when the facility is closed altogether, such as on Sundays, holidays, and in the evening, and on days when no patients are scheduled to come to the facility.  If, as the City claims, the goal of the ordinance is to allow **patients to "seek and obtain medical care"** without concern for impeded access, certainly the ordinance's all-day, every-day approach is not the least restrictive means for achieving the City's asserted interest.  It is not even narrowly-tailored to that interest.

**B.      The Buffer Zone Ordinance is a Content-Based Restriction on Speech**

Laws that "'by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.'"  *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) (quoting *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642-643 (1994)).  "Content-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people.  To guard against that threat the Constitution demands that content-based restrictions on speech be presumed invalid, and that the Government bear the burden of showing their constitutionality."  *Ashcroft v. American Civil Liberties Union*, 542 U.S __, 124 S.Ct. 2783, 2788, 159 L.Ed 2d 690 (2004) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992), and *United States v. Playboy Entertainment*, 529 U.S. 803, 817 (2000)).  "A

7

restriction based on content survives only on a showing of necessity to serve a legitimate and compelling governmental interest, combined with least restrictive narrow tailoring to serve it." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 455 (2002) (quotation omitted). "[S]trict scrutiny leaves few survivors." *Id.*

### 1. The buffer zone ordinance does not apply to commercial speech, soliciting, panhandling, opinions, or sentiments

As noted *supra*, the challenged ordinance prohibits "protesting, picketing, distributing leaflets or handbills," or engaging "in oral advocacy, education, or counseling activities" within the fixed buffer zone. None of these terms are defined.

Protesting and picketing are forms of political speech protected under the First Amendment. *See, e.g., Frisby,* 487 U.S. at 478 (anti-picketing ordinance "operates at the core of the First Amendment by prohibiting [demonstrators] from engaging in picketing on an issue of public concern"); *Carey*, 447 U.S. at 460 (same). They are, by their very nature, non-commercial. *See Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562 (1980) ("our decisions have recognized the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.) (citations omitted). *See also Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 67-68 (1983) (distinguishing commercial and non-commercial speech).

The buffer zone ordinance prohibits only non-commercial political speech, *i.e.,* "picketing" and "protesting." Therefore, a person may stand or pace back and forth in the buffer zone while wearing a sandwich sign that says "Eat at Joe's," or may hold a sign that says "Buy U.S. Savings Bonds." In addition, a person may display a sign that says, "I am proud of our military in Iraq," or a sign that says, "I love Planned Parenthood"

because these signs involve neither picketing nor protesting. The signs merely express personal sentiment or a personal message. If these same persons merely change a few words in the message contained on the sign, however, they fall within the purview of the ordinance. For example, signs that say, "I object to the military presence in Iraq," or "Don't support Planned Parenthood" are forms of protest, and therefore fall within the ordinance's proscriptions.

Neither does the ordinance prohibit solicitation or panhandling. Thus, persons may, within the buffer zone, approach vehicles and pedestrians and ask for money, either for themselves or on behalf of others. Two children may set up a lemonade stand within the buffer zone, and a vendor may hawk newspapers or hotdogs. The ordinance permits perhaps as many as forty (40) people to line up side by side and remain in the buffer zone so long as they are silent, do not display any sort of political or moral message, and do not impede access. These examples demonstrate that police "'must necessarily examine the content of the message that is conveyed'" before the ordinance may be applied *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (quoting *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987)). The simple examples demonstrate that the ordinance is content-based.

**2.  Content-based restrictions are presumptively invalid**

Because the message determines whether a sign falls within the ordinance's scope, it is content-based. "'Content-based regulations are presumptively invalid.'" *Playboy Entertainment*, 529 U.S. at 817 (quoting *R.A.V.*, 505 U.S. at 377). Moreover, "[w]hen a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be

ineffective to achieve its goals." *Playboy Entertainment*, 529 U.S. at 816.

The City's asserted interests are public safety, free flow of traffic, safe access to health care facilities, and protection of private property. *See* Buffer Zone Ordinance, attached to Complaint as Ex. 1. Achieving these interests could be accomplished simply by prohibiting blocking and/or impeding traffic and enforcing trespass laws. The City's interests certainly do not require the overly-broad and blanket prohibitions contained in the ordinance. In fact, they do not require a buffer zone at all. Indeed, existing law already prohibits blocking and trespass. *See* West Palm Beach Code §. 78-1 ("It shall be unlawful for any person to obstruct or hinder the free flow of pedestrian or vehicular traffic on any street, sidewalk or bicycle path in the city"); and *Fl. Stats*. § 810.09 (criminalizing trespass on private property).

### 3. Unlike *Hill*, *McGuire*, and *Edwards*, the challenged ordinance does not permit a speaker to approach a willing listener

The language of the challenged ordinance is substantially different than the language employed in *Hill*, *McGuire*, and *Edwards*. *Hill* for example, prohibited "passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling" within floating buffer zones. 530 U.S. at 708 n.1. Likewise, *McGuire* made it unlawful to "knowingly approach another person" without consent "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling." 386 F.3d at 48. As noted by the High Court in *Hill*, the Colorado statute did not "place any restriction on the content of any message that anyone may wish to communicate to anyone else, either inside or outside the regulated areas." 530 U.S. at 708. The *McGuire* court, too, found that "[t]he challenged statute permits speech or conduct within the six-foot zone so long as it is consented to by the person

approached.  It also places no restrictions in speech or conduct outside of the six-foot zone." 386 F.3d at 49.  The ordinances in *Hill* and *McGuire* plainly permitted the speaker to go inside the buffer zone to communicate with willing listeners, and did not require a standing speaker to move away from anyone passing by.  So did the ordinance at issue in *Edwards*.  *See* 368 F.3d at 49.

Unlike *Hill*, *McGuire*, and *Edwards*, the challenged ordinance here completely bans leafleting, counseling, or education in the buffer zone **even where the listener is willing to receive the literature, counseling, or education**.  Thus, a clinic patient who desires to receive literature or counseling must park her car in the parking lot and then return to the public ways outside the buffer zone to receive the literature or counseling. This places an unnecessary and unreasonable burden on the patient.  Consequently, the buffer zone ordinance infringes, not only the rights of speakers, **but the rights of willing patients to receive information as well.**  "That individuals have a fundamental First Amendment right to receive information and ideas is beyond dispute." *Bell v. Wolfish*, 441 U.S. 520, 573 (1979) (citing *Martin v. Struthers*, 319 U.S. 141, 143 (1943); *Stanley v. Georgia*, 394 U.S. 557, 565 (1969)).  Even injunctions, which are designed to prevent an adjudicated wrongdoer from repeating the wrongful conduct, must be narrowly tailored so as not to unnecessarily infringe First Amendment rights.  See *Schenck v. Pro-Choice Network, Inc.*, 519 U.S. 357, 377-79 (1997) (striking down injunction imposing fifteen (15) foot floating buffer zones because they "burden more speech than is necessary to serve the relevant governmental interests," and excluded "normal conversations").  The buffer zone at issue here is a law of general applicability. It applies to the public at large, not merely to persons who were adjudicated wrongdoers

by a court and then enjoined from engaging in future wrongful conduct.

**B.    The Buffer Zone Ordinance Does Not Satisfy the Requirements for a Valid Time, Place, and Manner Regulation**

Even assuming, *arguendo*, that the buffer zone regulation is not content-based, it does not satisfy the requirements for a content-neutral, time, place, and manner regulation.   As a shown *supra*, Plaintiffs intend to exercise their First Amendment rights on public sidewalks and streets.   "In these quintessential public for[a], the government may not prohibit all communicative activity."   *Frisby*, 487 U.S. at 481.   Yet, that is exactly what the buffer zone does.

"The showing that a law punishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate **all** enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2004) (emphasis in the original) (quotation omitted).   Time, place, and manner regulations are valid so long as they are "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Frisby*, 487 U.S. 481 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

"A [regulation] is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485 (citing *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U.S. 789, 808-810 (1984)).   "A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Id.*

### 1.      The buffer zone ordinance is not narrowly tailored

The recitations in the buffer zone ordinance indicate that the City's purpose in enacting the ordinance was to promote public safety, free flow of traffic, safe access to health care facilities, and protection of private property.[1] *See* Buffer Zone Ordinance. As *Frisby* instructs, to be narrowly tailored the buffer zone must regulate only those activities that are implicated by the 'evils' which the City seeks to target, namely public safety, free flow of traffic, safe access to health care facilities, and protection of private property. *See id.* Yet, the buffer zone ordinance prohibits persons exercising First Amendment rights from coming within twenty (20) feet of the driveways and entrances of health care facilities at all times and in most circumstances. *See* § 78-425(2).

For example, the ordinance prohibits even a single person from displaying a political sign or handing out political literature in the buffer zone. It prohibits a person who is wearing a t-shirt that contains a political or moral message from even walking on the public sidewalk to get from one place to another, . Indeed, because the prohibitions in the ordinance are not limited to certain times or days, the public sidewalk adjacent to health care facilities are off-limits to people wearing certain types of expressive clothing twenty-four (24) hours per day, 365 days a year. The ordinance also prohibits "education" in the buffer zone. A person standing in the buffer zone who responds to a driver's request for directions is in violation of the ordinance. Even a mother who recites the alphabet with her child -- thereby "educating" the child, violates the ordinance.

---

[1] The recitation also states that the City recognizes "the right of citizens to privacy." There is, of course, no expectation of privacy in public places. *See, e.g., United States v. Santana,* 427 U.S. 38, 42 (1976); *Katz v. United States,* 389 U.S. 347, 351 (1967); *Hester v. United States,* 265 U.S. 57, 59 (1924).

The severe restriction on the exercise of First Amendment rights imposed by the buffer zone ordinance is simply is not necessary to achieve the City's stated goals. The City can achieve its goals simply by prohibiting persons from 1) impeding and blocking of the entrances and driveways, and 2) entering onto private property without the owner's consent. As noted *supra*, a narrowly tailored regulation must do no more than target the exact evil it seeks to remedy. *Frisby*, 487 U.S. at 485. Because the buffer zone ordinance regulates constitutionally protected speech far beyond that necessary to achieve the City's stated interest, it is not narrowly tailored,[2] and therefore unconstitutional.

### 2. The buffer zone ordinance does not leave open ample alternative avenues of communication

The Supreme Court has indicated that injunctions, much less laws of general applicability, must not infringe more speech than necessary. To that end, the Supreme Court has indicated that regulations must not be so broad as to prevent speakers from engaging in "normal conversation" with their audience. In *Schenck*, for example, the Supreme Court struck down an injunction because "the floating buffer zones prevented protesters from engaging in speech which 'lie[s] at the heart of the First Amendment,' such as having "a normal conversation with people entering or leaving the clinics or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks."[3] *Lucero v. Trosch*, 121 F.3d 591, 604 (11th Cir. 1997) (quoting *Schenck*,

---

[2] To the degree the City intended the reactions of patients to serve as a basis for the regulations, it is well-settled that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County*, 505 U.S. at 134 (citing *Boos*, 485 U.S. at 321 (1988); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55-56 (1988); and *Murdock v. Pennsylvania*, 319 U.S. 105, 116 (1943)).

[3] The *Schenck* Court upheld a fifteen (15) foot fixed buffer zone, explaining that "we have before us a record that shows physically abusive conduct, harassment of the police

[519 U.S. at 866-67]).  *See also Sabelko v. City of Phoenix*, 120 F.3d 161, 165 (9th Cir. 1997) (striking down ordinance because "[a]n individual within the access area to a clinic can invoke the eight-foot floating buffer zone, effectively preventing handbilling and normal conversation").  As noted *supra*, the ordinances upheld in *Hill*, *McGuire*, and *Edwards* permitted speakers to enter the buffer zone to speak with to listeners, thus allowing ample opportunity for the speakers to effectively communicate their message..  By contrast, the ordinance here **places a complete ban on all oral speech and literature distribution within the zone**.  Under Supreme Court precedent, the ordinance does not leave open ample alternative avenues of communication, and thus is unconstitutional.

## III.   THE SOUND ORDINANCE IS UNCONSTITUTIONAL

The sound ordinance challenged here states, in pertinent part,

> No person shall produce, cause to be produced, or allow to be produced, by any means, any unnecessary noise or amplified sound, operate or play any radio, phonograph, stereo set, or CD player, television, sound amplifier, or other electronic audio device that produces or reproduces amplified sound on any public street or sidewalk within 100 feet of any portion of a building housing a health care facility or any other institution reserved for the sick and infirmed . . . ."

Sec. 34-38(b).  Violation subjects the offender to criminal penalties, including up to a $500.00 fine and/or sixty (60) days in jail. Sec. 34-38(d) (incorporating § 1-13).

### A.   The Sound Ordinance Unconstitutionally Imposes Strict Liability

As a threshold matter, this ordinance has no *mens rea* component, *i.e.*, "knowingly," "willfully," "purposely,' "intentionally," etc., and therefore imposes strict liability for its violation.  While strict liability may be imposed for a civil violation or

---

that hampered law enforcement, and the tendency of even peaceful conversations to devolve into aggressive and sometimes violent conduct." *Schenck*, 519 U.S. at 377.  In the instant case, Plaintiffs' challenge a law of general applicability, not an injunction. Even assuming, *arguendo*, wrongful conduct on the part of a few, the ordinance severely restricts the free speech rights of the entire citizenry.

infraction imposing only a monetary fine, it cannot be imposed where a violation subjects the offender to possible incarceration, especially where First Amendment rights are at stake. *See, e.g., New York v. Ferber,* 458 U.S. 747, 765 (1982) ("criminal responsibility may not be imposed without some element of scienter on the part of the defendant"); *Smith v. California,* 361 U.S. 147, 151 (1960) (overturning obscenity conviction where the statute charged had no scienter requirement).

Moreover, "[w]hen a strict liability statute potentially affects First Amendment freedoms, it may 'have the collateral effect of inhibiting the freedom of expression by making the individual the more reluctant to exercise it.'" *American-Arab Anti-Discrimination Committee v. City of Dearborn,* 418 F.3d 600, 611 (6th Cir. 2005) (quoting *Smith,* 361 U.S. at 151). Thus, even where government asserts legitimate interests, "its interest must be 'exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.'" *American-Arab Anti-Discrimination Committee,* 418 F.3d at 611 (quoting *Cox v. New Hampshire,* 312 U.S. 569, 574 (1941)). Consequently, where, as here, the "strict liability component of the Ordinance chills the exercise of First Amendment rights," it "is unconstitutional because 'any statute that chills the exercise of First Amendment rights must contain a knowledge element.'" *American-Arab Anti-Discrimination Committee,* 418 F.3d at 611 (quoting *Video Software Dealers Ass'n v. Webster,* 968 F.2d 684, 690 (8th Cir.1992)). In *American-Arab Anti-Discrimination Committee,* the Sixth Circuit struck a parade ordinance because, "[u]nder the Ordinance, any person who unknowingly participates in a permitless march may be arrested, fined up to $500, placed

in jail for ninety days, or both"). 418 F.3d at 612.

The same is true here, *i.e.*, "[n]o person shall produce, cause to be produced, **or allow to be produced, by any means,**" the prohibited sound.  If a group of persons participate in a demonstration, and one or more use sound amplification in violation of the ordinance, anyone in the group may be arrested for "allow[ing]" the amplification according to the plain terms of the ordinance.  Such potential for arrest places an unconstitutional chill on free speech.

### B.      The Sound Ordinance is Substantially Overbroad

"The overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep."  *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quotation omitted).  *See also Forsyth County*, 505 U.S. a 130; *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).  Thus, when a realistic danger exists that a statute or ordinance "will significantly compromise recognized First Amendment protections of parties not before the court, it must be declared unconstitutionally overbroad." *Taxpayers for Vincent*, 466 U.S. at 801.

The challenged ordinance makes unlawful "any unnecessary noise or amplified sound, operate or play any radio, phonograph, stereo set, or CD player, television, sound amplifier, or other electronic audio device that produces or reproduces amplified sound on any public street or sidewalk within 100 feet of any portion of a building housing a health care facility. . . ."  Sec. 34-38(b).  The ordinance thus captures not only persons using a sound amplification device directed at persons entering a health care facility, but also the motorist who, with his windows closed, is playing the radio as he drives by the

facility, or the teenager who is listening to a walkman as she skips along the sidewalk outside a facility.  Neither of these individuals is making sounds that can be heard by others.  They nevertheless fall squarely within the prohibitions of the ordinance.

Moreover the "100-foot" restriction creates a blanket ban on the use of amplified or reproduced sound regardless of whether it can be heard inside the health care facility. The purpose for the ordinance, which appears to be to prevent unnecessary noise or amplified sound that "can cause severe stress, heightened anxiety, and elevated blood pressure to patients seeking health services," is simply not served where amplified sound either cannot be heard or is not loud enough to cause the conditions of concern.  Indeed, the appropriate remedy is to regulate the decibel level that can be heard at the health care facility.  A blanket prohibition on all sound amplification or reproduction is not narrowly tailored to the City's asserted interest, and should be stricken.

### C.    The Sound Ordinance is Unconstitutionally Vague

The sound ordinance prohibits "unnecessary noise." This term is not defined in the ordinance.  "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted). "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, the more important aspect of vagueness doctrine is not actual notice, but the other principal element of the doctrine--the requirement that a legislature establish minimal guidelines to govern law enforcement." *Id.* at 357-58 (citation omitted). "Where the legislature fails to provide such minimal guidelines, a criminal statute may

permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* at 358 (citation omitted). Moreover, a vague law causes citizens to "steer far wider of the unlawful, zone than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).

The subjective term "unnecessary noise" is inherently vague, and has been struck down by numerous courts. *See Jim Crockett Promotion, Inc. v. City of Charlotte*, 706 F.2d 486, 489 (4th Cir.1983) ("unnecessary" noise prohibition unconstitutionally vague); *Baldwin v. City of Jackson*, 2004 WL 1877949 at *3 (S.D.Miss. 2004) (same); *Dae Woo Kim v. City of New York*, 774 F.Supp. 164, 169 (S.D.N.Y.1991) (same); *Nichols v. City of Gulfport*, 589 So.2d 1280, 1283 (Miss.1991) (same); *People v. New York Trap Rock Corp.*, 57 N.Y.2d 371, 442 N.E.2d 1222 (1982) (same).

**D.    The Sound Ordinance Violates Plaintiffs' Rights to Equal Protection**

"The Equal Protection Clause requires that the government treat similarly situated persons in a similar manner." *Gary v. City of Warner Robins*, 311 F.3d 1334, 1337 (11th. Cir. 2002) (citing U.S. Const. amend. XIV, § 1). "When legislation classifies persons in such a way that they receive different treatment under the law, the degree of scrutiny the court applies depends upon the basis for the classification." *Id.* (citing *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (per curiam); *Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000), *cert. denied*, 532 U.S. 978 (2001)). "If a fundamental right or a suspect class is involved, the court reviews the classification under strict scrutiny." *Id.* (citing *Murgia*, 427 U.S. at 312; *Mason v. Lister*, 562 F.2d 343, 346 (5th Cir. 1977)). A right is fundamental "it is explicitly . . . guaranteed by the Constitution." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 29

(1973).  Sound amplification is protected by the First Amendment.  *See Saia v. People of the State of New York*, 334 U.S. 558, 561-562 (1948) ("loud-speakers are today indispensable instruments of effective public speech" and therefore protected by the First Amendment); *Reeves v. McConn*, 631 F.2d 377, 382 (5th Cir.1980) (The "right to communicate inherently comprehends the right to communicate effectively").  Because sound amplification is protected speech, the sound ordinance is subject to strict scrutiny.

The challenged ordinance (§ 34-38(2)) regulates use of sound on public streets and sidewalks, and prohibits the use of any sound amplification or reproduction equipment within 100 feet of a health care facility twenty-four (24) hours per day, 365 days per year.  Section 34-35, which regulates the use of sound on private property, contains no such restriction.[4]  Therefore, it is permissible to use sound amplification or reproduction equipment on private property but not public sidewalks and streets.  The City's sound ordinance scheme thus permits, for example, clinic escorts to play loud music on clinic property in order to drown out or disrupt Plaintiffs' message, which actually has happened dozens of times over the past two years.  *See* Pine Decl. ¶ 5; Halfpap Decl., ¶9; Seelinger Decl., ¶9, Blackburn Decl., ¶9.  If preventing strees, anxiety, and increased blood pressure is the purpose for the ordinance, there is not rational basis, let alone compelling interest, for such disparate treatment of protected speech.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to a temporary restraining order enjoining enforcement of WPB Code §§ 78-425 and 34-38(b).

---

[4] Section 34-35 states, in its entirety, "[a]t all times, it shall be unlawful for any person to cause or permit to originate from the real property he controls any sound that crosses a real property line at a volume that is unreasonably loud."

FOR THE PLAINTIFFS


Michael J. DePrimo, MS Bar # 10813
(Subject to admission pro hac vice)
Stephen M. Crampton, MS Bar #9952
(Subject to Admission pro hac vice)
Brian Fahling, WA Bar #18894
(Subject to admission pro hac vice)
AMERICAN FAMILY ASSOCIATION
CENTER FOR LAW & POLICY
P.O. Drawer 2440/100 Parkgate Drive
Tupelo, MS  38803
(662) 680-3886 (tel)
(662) 844-4234 (fax)


George L. Sigalos, Esq.
SIMON, SIGALOS & SPYREDES, P.A.
120 East Palmetto Park Road
Suite 100-D
Boca Raton, Florida 33432
(561) 447-0017 (tel)
(561) 447-0018 (fax)